## LUCE *v.* STOTT REALTY CO.

1. FIXTURES—RESERVATION OF TITLE.
   Where the seller of opera chairs installed in a leased theatre building reserved the title as security, they did not become fixtures.

2. SALES—RESERVATION OF TITLE—SECURITY.
   A written contract of sale of opera chairs to the lessee of a theatre building, together with the testimony of the surrounding circumstances and the intent of the parties, as gathered from the contract, *held,* to amount to a sale, with the reservation of the title as security for the indebtedness.

3. SAME—CONTRACTS—INTENT—CONDITIONAL SALES.
   Whether a sale of personal property is absolute or conditional depends upon the contract of the parties.

4. SAME—LANDLORD AND TENANT—LANDLORD'S RIGHTS—LEASE—
   NOTICE—CONSTRUCTIVE NOTICE.
   Where actual notice of the lessor's rights under the lease
   was shown to have been given to the seller of opera chairs
   installed for the lessee in a theatre building under a
   written contract reserving title in the seller, the question
   of constructive notice became, unimportant.

5. SAME—EVIDENCE—GENERAL ISSUE—STATUTES—REPLEVIN.
   Evidence of actual notice was admissible, under the general
   issue, by virtue of section 13102, 3 Comp. Laws 1915.

6. SAME—LANDLORD AND TENANT—LEASE—LANDLORD'S RIGHTS—
   NOTICE—LIEN ON PERSONALTY INSTALLED.
   Where the seller was notified before the sale that any
   chairs installed would be subject to the terms of defend-
   ant's lease, which gave defendant a lien on all equipment
   installed, defendant's lien was superior to that of the
   seller.

7. SAME—EVIDENCE—ADMISSIBILITY—COURT FILES.
   The court below was in error in admitting in evidence the
   files in a suit by the lessor against the lessee, since they
   were irrelevant and immaterial, and did not tend to show
   that the lessor had a lien on the chairs.

8. SAME—REPLEVIN—JUDGMENT — DIRECTED VERDICT — DETERMINA-
   TION OF LIEN.
   Where the only interest the lessor had in the chairs was a
   lien, the court below was in error in directing a verdict
   of not guilty in its favor; the lien should have been
   ascertained and determined and judgment entered therefor.

Error to Wayne; Murphy, J. Submitted April 5,
1918. (Docket No. 44.) Decided June 3, 1918. Re-
hearing denied January 31, 1919.

Replevin by Theodore Luce against the Stott Realty
Company for the possession of certain opera chairs.
Judgment for defendant on a directed verdict. Plain-
tiff brings error. Reversed.

*Anderson, Wilcox & Lacy,* for appellant.

*Robert M. Brownson,* for appellee.

STONE, J. This is an action in replevin to recover

the possession of certain opera chairs installed in the Broadway Theatre in the city of Detroit, and damages for their detention. On January 31, 1912, and prior thereto, the Stott Realty Company was the owner of certain vacant premises in said city on which now stands the Broadway Theatre. On that date, under the terms of a written instrument, recorded in the office of the register of deeds for the county of Wayne, on February 13, 1912, entered into by said company, designated as the lessor, and by Benjamin Jacobson and Philip Gleichman therein designated as the lessees, the Broadway Theatre was erected by the defendant, and leased to Jacobson and Gleichman for a term of 10 years from and after August 15, 1912, at an annual rental of $24,640. The material portions of this agreement and lease, which are necessary to an understanding of the issues involved herein, are as follows:

"VI. *Lessor to Erect Building.*

"Said lessor agrees to erect upon the said premises a theatre building of fire proof construction and so-called Type No. 1, to be 98.47 ft. front on Broadway and 110 ft. in depth, and to fully complete said building except such portions thereof as said lessees are to furnish as hereinafter set out. The said building shall be built in accordance with plans and specifications drawn by Arland W. Johnson, architect, of Toledo, Ohio; each of the parties hereto receiving a copy of said plans and specifications, dated with even date herewith and signed by the parties hereto; the said plans and specifications are hereby made a part of this lease as though embodied herein. The said lessor shall begin the erection of said building at once and complete the same not later than the first day of October, 1912, unless prevented by strikes, riots, fires, or other causes beyond the control of the said lessor (lack of money to be no excuse), with the following exceptions which the said lessees agree to furnish at their own expense, and in accordance with the said plans and specifications, to wit: All stage equipment and fur-

nishing, asbestos curtain, act drop, painted curtains or velour curtain, stage braces, medallions, curtains, rugs, stage properties of every description, all dressing room furniture including rugs and mirrors, all carpets and draperies and rugs for all portions of the building, all furnishing of all rooms, all decorating, opera chairs and electric advertising signs. The foregoing parts of the said building and furnishing to be put in by said lessees shall be furnished as soon as can reasonably be done after the building is ready for the same, and the said building shall be deemed completed in so far as the beginning of the term of this lease and the beginning of payments of rent are concerned when said lessor shall have completed said theatre building, with the exception of the parts to be built and furnished by said lessees, as above set out.  *  *  *

### "VIII.—*Liens, Etc.*

"Nothing herein contained shall authorize the lessees to do any act or make any contract so as to encumber in any manner the title of said lessor to said premises or to create any liens upon its interest in said land or any buildings at any time standing thereon, it being expressly agreed that the parts of said theatre to be supplied by said lessees as in paragraph VI provided, as well as all repairs and any improvements and alterations in or to said building made by said lessees, shall be paid for in cash or its equivalent; that they will not make any contract or agreement for their part of the construction of the said building or for any additions to, improvements upon or repairs of said building, or of any building at any time standing on said premises, or for any work to be done or materials furnished, without providing in said contract or agreement that no liens shall thereby be created or arise thereunder upon or against said lessor's interest in the premises; and it is especially agreed (notice being hereby given to that effect) that no contract, transfer, assignment, mortgage, mechanic's lien or other lien shall in any manner affect the title of said lessor in said premises or its interest under this lease in any buildings, additions or improvements at any time standing thereon.  *  *  *

"XVI.—*Lien on Lessees' Interest.*

"The parties hereto further agree that the whole amount of rent hereinbefore agreed to be paid, and each and every installment thereof, of all taxes, assessments, and insurance premiums paid by said lessor under the provisions hereof, shall be and they are hereby declared to be a valid and first lien upon all these parts of the said building furnished by said lessees therefor in pursuance of paragraph VI, and everything furnished in renewal thereof, and all other equipment placed in the said building or upon the said premises by the said lessees."

Under their agreement to build and furnish certain parts of the theatre building and equipment, Jacobson and Gleichman on September 28, 1912, placed a written order with the American Seating Company of Chicago, to make, deliver and install in the Broadway Theatre 1,642 opera chairs as follows:

```
646 Style 1041, Main floor .............@  $3.80 each
554 Style 1041, Balcony ...............@   2.80 each
442 Style    9, Gallery ...............@   1.55 each
```

This written order, besides reciting the terms of payment, the method of installation of the opera chairs, etc., contained the following provision:

"(5) That the title to all of said seating and merchandise and every part thereof, together with the right to possession thereof, shall remain in you until full payment therefor in cash shall have been made as herein provided. And we further agree that in the event of our failing to make payment, or settlement, of the full purchase price, or of any installment thereof, as herein stipulated, or to pay at maturity any note given in full, or part payment thereof, you may, at your election, without demand upon or notice to us, take possession of said property, in which event you may consider all payments which may have been made by us prior to such retaking as payments made for the use, wear and tear of said property and upon the final vesting of the possession of said property in you all further obligation on our part hereunder shall cease,

and any notes given by us evidencing any part of the purchase price, and which, at that time may be unpaid shall be canceled and this contract dissolved. Or, in the event of any default on our part as aforesaid, you may, at your election, declare the entire unpaid balance of the purchase price due and payable, and upon the retaking of said property, and upon notice to us of such election, sell said property at public or private sale, but without further notice to us, and apply the proceeds of such sale, first in payment of all expenses and costs of such retaking and selling, and the balance, if any, together with all payments which may have been theretofore made by us, upon the purchase price of said property, paying to us the surplus, if any, and should any deficiency then exist between the purchase price of said property herein agreed by us to be paid, and the net amount so received by you, less the expense and costs of retaking and selling, we agree to pay such deficiency; but under no circumstances shall the title to, or right to possession of said property become vested in us hereunder unless the full purchase price thereof is paid prior to any retaking by you of said property as herein provided."

Prior to the placing of this order for the opera chairs by Jacobson and Gleichman, various seat manufacturers had been invited to make proposals for furnishing seats for the Broadway Theatre. The seats to be selected were to be approved by the architect, and with this purpose in view, the architect and David Stott, president of the Stott Realty Company, met the representative of the American Seating Company at the Pontchartrain Hotel in Detroit, where he had the samples of chairs on exhibition. Mr. Stott testified, and he was uncontradicted, that he notified the agent of the American Seating Company, of the Broadway Theatre lease; that the Stott Realty Company was the owner of the property, and that Jacobson and Gleichman were mere lessees; "that the seats as were put into that house became the property of the house according to the terms of the lease, and therefore he

must look to them (Jacobson and Gleichman) for the pay."

On October 30, 1912, by written agreement, the interest of Jacobson and Gleichman, as lessees in the Broadway Theatre lease, was transferred to the United Amusement Company. The consideration for the consent on the part of the Stott Realty Company to such assignment of the lease was the agreement on the part of the United Amusement Company to pay $2,500 per year additional rental to that stipulated in the lease. All of the other terms and conditions of the lease, except the amount of rental to be paid, were stipulated should remain in full force and effect as though the United Amusement Company had been named as the original lessee.

On December 1, 1912, the United Amusement Company placed an amended order with the American Seating Company for the opera chairs to be installed in the Broadway Theatre, by which the quantity of such chairs was to be reduced from 1,642 to 1,496, as follows:

    582 Style 1041, Main floor .............@   $3.80 each
    456 Style 1041, Balcony ...............@    2.80 each
    458 Style    9, Gallery ...............@    1.55 each

The terms, conditions, and provisions of the amended order are identical with the terms, conditions, and provisions of the original order, with the exception of the number of chairs to be furnished, the terms of payment, and also with the exception of the following provisions:

"For chairs ordered under terms of contract dated September 28, 1912, and not taken by us, we agree to pay American Seating Company, as compensation therefor, the sum of $100 in addition to the amount of purchase price above specified, said payment to be made with last installment above provided. This compensation is for labor and material expended at, and

by American Seating Company in connection with said chairs.

"(4) If for any reason whatsoever, we make any change reducing the quantity of chairs shown by the original seating plan, after said chairs are partially or entirely manufactured, we agree to pay you at the stipulated price, for each and every chair furnished by you in accordance with such original plan (said plan being a part of this contract), whether all of said chairs are installed in the building or not."

On or about December 30, 1912, the American Seating Company delivered and installed 1,498 opera chairs which were billed to the United Amusement Company at the sum of $4,328.40. The invoice for these chairs recites that the following sizes and quantities of chairs were "Sold to United Amusement Company":

| Quantity | Size | Description | Price | Amount |
|---|---|---|---|---|
| 594 | 1041 | Chairs for Main floor.. | $3.80 | $2,257.20 |
| 456 | 1041 | Chairs for Balcony.... | 2.80 | 1,276.80 |
| 448 | 9 | Chairs .............. | 1.55 | 694.40 |
| Cost of labor and material on Balcony Chairs partly manufactured but omitted at your request ............... | | | | 100.00 |
| | | | | $4,328.40 |

The invoice also contained the terms and dates of payments to be made.

The record is not clear as to the amount of payments made. It was the claim of the defendant that payments were made on this bill by the United Amusement Company until September 1, 1913, when a note for $200, payable three months after date was given, as the final payment. This note bears indorsement on the back of a payment of $53.53 December 3, 1913.

The United Amusement Company occupied and operated the Broadway Theatre until on or about November 21, 1913, when, with the consent of the Stott Realty Company, it entered into a sublease with Benjamin Fay Mills. Mills paid the December rent as

stipulated in the lease for the month of December, 1913, but defaulted in the January, 1914, rent, and the same was not paid by any one. No rental insurance, or indemnity insurance was ever taken out, as provided for in the lease. Fire insurance was taken out, but upon failure to pay for the same, it was canceled, and it became necessary for the Stott Realty Company to take it out and pay for it. Some of the fixtures and furnishings, including the opera chairs involved in this suit, and put into the theatre by the United Amusement Company, in accordance with paragraph VI of the lease, were not paid for. On January 16, 1914, it was claimed that a grossly immoral show was given at the theatre, causing considerable notoriety, and on January 20, 1914, the Stott Realty Company served a notice on the United Amusement Company and Mills, declaring the lease forfeited, and stating the grounds to be the failure to pay rent, to procure rental and indemnity insurance, and the giving of an immoral show, and on the same date made a peaceable reentry into the premises and took possession of all of the property of the United Amusement Company therein contained, and asserted its lien thereon in accordance with the provisions of paragraph XVI of the said lease.

It appeared, under the objection of plaintiff, that suit was commenced on July 14, 1914, by the Stott Realty Company against the United Amusement Company. (Counsel state, but the record is silent on the subject, that after the trial of the instant case, said suit was tried, a verdict was directed in favor of the Stott Realty Company, and judgment entered for $15,-769.26. The case was reviewed in this court on writ of error and the judgment was affirmed, and is reported in 195 Mich. 684.)

On January 30, 1914, the plaintiff acquired by assignment, all of the right, title, and interest of the

American Seating Company in and to the so-called contract of conditional sale, and in and to the balance of the purchase price remaining unpaid thereon. On February 10, 1914, the plaintiff served on the defendant by United States mail a written notice that he had purchased the said contract, and was the holder of a $200 note given in connection with said contract, and demanded a return of the said opera chairs. Possession of the said chairs being refused by the defendant, on March 19, 1914, a writ of replevin was issued in this suit, and upon service of the writ, defendant gave a bond to the sheriff, under the statute, to retain possession of the opera chairs until the outcome of this suit. It should be stated that the defendant had no notice or knowledge that the United Amusement Company did not pay cash for the chairs installed, until receipt of the notice from the plaintiff on February 10, 1914. The declaration was in the usual form in replevin. The plea was the general issue with special notice that under the terms of the original lease, and of the written assignment, the chairs in question were installed in said opera house subject to the terms of said lease and assignment, and subject to any claim of defendant under said lease and assignment.

At the close of the evidence the trial court directed a verdict for the defendant to the effect that it was not unlawfully withholding the possession of the chairs from the plaintiff, and a judgment was entered for the defendant accordingly. The plaintiff has brought the case here for review, and by proper assignments of error it is claimed by his counsel that the following questions are raised by the facts and pleadings:

(1) Did the chairs become fixtures?

(2) Was the agreement of December 1, 1912, a contract of sale or a chattel mortgage?

(3) Did the lease of January 31, 1912, create a lien in favor of the lessor, paramount to the title lien re-

tained by the American Seating Company under its contract of December 1, 1912?

(4) Did the court err in admitting in evidence the files in the case of the *Stott Realty Co.* v. *Amusement Co.*, and in directing a general verdict for the defendant, without having determined the amount of defendant's lien?

1. The trial court held, in accordance with the claim of the plaintiff, that the chairs did not become fixtures. We agree with the trial court in this holding.

2. What was the nature of the agreement of December 1, 1912? A careful reading of this agreement, the invoice and statement, together with the testimony of the surrounding circumstances, and of the intent of the parties, as gathered from the contract, leads us to the conclusion that the transaction amounted to a sale, with the reservation of the title as security for the indebtedness. Whether a sale of personal property is absolute or conditional depends upon the contract of the parties. *Atkinson* v. *Japink*, 186 Mich. 335; *Holcomb & Hoke Manfg. Co.* v. *Cataldo*, 199 Mich. 265. In the above cited cases we held that title was retained in the property for security merely, and such, we think, was the case here.

As was said in *Chicago Railway Equipment Co.* v. *Merchants' Bank*, 136 U. S. 268, 280:

"The fact that, by agreement, the title is to remain in the vendor of personal property until the notes for the price are paid, does not necessarily import that the transaction was a conditional sale."

See, also, *Harkness* v. *Russell*, 118 U. S. 663.

While the learned trial judge was of the opinion that the transaction amounted to a conditional sale, we do not disagree with his conclusion that, under the terms of the instrument, the plaintiff would have the right to maintain replevin, were it not for the third question.

3. Upon this branch of the case the jury were charged as follows:

"It is urged, as a third ground, by the defendant, that, in any event, there has been a breach in the terms of the lease of the property in question; and indisputably under this evidence there has been a breach. The lessees failed at least in the payment of the rental of the theatre; and it is alleged they failed in other respects as well. Examining the lease of the property in this case, which is exhibit 9, and its assignment, exhibit 10, it is found, in paragraph 16 of the lease, that lessor and lessees agree that, should any default in the terms of the lease be made on the part of the lessee, the lessor of the property would have a right to assert a lien against the improvements put by the lessees on this property; and according to paragraphs six and eight of this lease, part of the very property which the lessees were to install in the theatre were these very chairs. And paragraph eight of the lease provided that, in installing these chairs, the lessees were to pay for them in cash or its equivalent. Now, the lessees failed in observing that condition of their lease; they did not pay for these chairs in cash or its equivalent; but without any knowledge on the part of the lessor, they violated that agreement of theirs, and they bought these chairs conditionally. They furthermore committed a breach of their lease by not paying the rent. So that, under paragraph 16, the lessors, when the default on the part of the lessees occurred, had a right to assert a lien for the amounts due to the lessors, and to claim that lien on those very chairs. That is what the defendant company is doing in this case. The defendant claims that, because of the terms of the lease which had been violated by the lessees, they have a right now to assert a lien against these chairs. That clearly is their right under the very terms of the agreement, unless something has arisen to amount to a waiver of the right or a breach of good faith on the part of the lessors.

"Has there been any breach of good faith on the part of the lessors? Manifestly not. The lessors did not know that these chairs were purchased upon conditional terms of sale. The lessors had the right to presume that the lessees were obeying their contract;

and, in buying and installing these chairs, were paying cash or its equivalent for them. The terms of the agreement for the sale of the chairs, exhibit 1, were private and secret, so far as the lessors were concerned, and they had no knowledge of them. What, on the contrary, was the position of the sellers of these chairs, the vendors, the American Seating Company? *First,* they had actual knowledge, through their agent, who came to Mr. Stott, of the rights which the lessees, who were the purchasers of the chairs, had in and to the premises. They had actual knowledge of that, gained from Mr. Stott, president of the defendant company. Furthermore, since the lease and its assignment, exhibits 9 and 10, were recorded in the office of the register of deeds, in this county, the seller of the chairs, the American Seating Company, had constructive notice of the terms under which the lessees held this property. So here, gentlemen, with actual notice and with constructive notice, the American Seating Company sold, to the lessees of this theatre, these chairs upon conditions and under circumstances which disclosed to the seller the terms under which the lessees were in possession of that property.

"That being so, and the seller, in addition to that, having specific and actual knowledge of the precise use to which these chairs were to be put, namely, their installation in this very theatre, owned by the defendant company, and the defendant company having in no way waived its rights under the lease, but having acted in good faith throughout, it is now in the position to rely on the terms of the lease and to assert a lien against these chairs for the moneys due, arising out of the breach and default of the lessees."

We agree in the main with this portion of the charge. We think, however, that, as actual notice to the seating company of the defendant's rights, under the lease, was shown, whether there was constructive notice or not became unimportant. Plaintiff claims that defendant could not properly show actual notice under the condition of the pleadings. We cannot agree with this contention. Such evidence was admissible under

the general issue by virtue of section 13102, 3 Comp. Laws 1915.

It is the claim of defendant that the principle of that part of the charge above quoted was applied by this court in *Jenks* v. *Colwell*, 66 Mich. 420, and the cases there cited. See, also, *Wickes Bros.* v. *Hill*, 115 Mich. 333, 339.

We are also of the opinion that the case does not differ in principle from that announced in *American Cigar Co.* v. *Foster*, 36 Mich. 368; *Robson* v. *Railroad Co.*, 37 Mich. 70, and kindred cases.

In the *Foster Case* it was held that a chattel mortgage of a stock of goods, which covered expressly, not only all goods then in the store, but all other goods to be thereafter put there, was valid as between the parties, to bind goods purchased by the mortgagor and added to the stock; and was also valid as to a subsequent purchaser who had actual knowledge of the mortgage; and the same doctrine was reiterated in the *Robson Case*. And the plaintiff stands on no better footing than his assignor.

After the representative of the American Seating Company was expressly notified by David Stott that those chairs, if sold to the lessees and placed in the building, would be subject to the terms of defendant's lease, that company deliberately and with full knowledge of the situation sold and installed the chairs therein; and under such circumstances it must be held that defendant's lien became superior to any claim of the American Seating Company, or its assignee.

4. We are constrained to hold, however, that under the provisions of section 13104, 3 Comp. Laws 1915, and the many cases cited and referred to in the note to that section, the trial court erred in admitting in evidence the files in the case of *Stott Realty Co.* v. *United Amusement Co.*, and in directing a general verdict for the defendant. The files in that case were

irrelevant and immaterial, and did not tend to show that defendant had a lien on the chairs. Under the provisions of the statute cited, it was error to direct a general verdict, and enter judgment of not guilty for the defendant. Manifestly, the only interest which the defendant had in the chairs was its lien. That lien should have been ascertained and determined and' judgment entered therefor. In our opinion this action of the court was prejudicial to the rights of the plaintiff, who had a right to know the extent and amount of defendant's lien. What has occurred in *Stott Realty Co.* v. *United Amusement Co.*, since the trial of the instant case, cannot be considered upon this record. For this error the judgment of the circuit court must be reversed and a new trial granted, with costs to appellant.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.